IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO


GLORIA ESCARCEGA,

       Plaintiff,

v.                                                  No. 99cv1039 JP/JHG


KENNETH S. APFEL,
COMMISSIONER OF SOCIAL SECURITY,

       Defendant.


AMENDED MAGISTRATE JUDGE'S PROPOSED FINDINGS
AND RECOMMENDED DISPOSITION

This matter is before the Court on Plaintiff's (Escarcega's) Motion to Reverse or Remand the Administrative Decision, filed June 12, 2000.  The Commissioner of Social Security issued a final decision denying Escarcega's applications for disability insurance benefits and supplemental security income. The Court, having considered the arguments, pleadings, administrative record, relevant law, and being otherwise fully informed, finds the motion to reverse is well taken and recommends that it be GRANTED.

Escarcega, now fifty-one years old, filed her applications for disability insurance benefits and supplemental security income on September 4, 1996, alleging a disability which commenced September 1, 1994, due to foot pain, back pain, stomach pain and bladder problems (stress urinary incontinence).  She has a high school education with past relevant work as a cashier and housekeeper.  The Commissioner denied Escarcega's applications for disability insurance benefits and supplemental security income both initially and on reconsideration.

After conducting an administrative hearing, the Commissioner's Administrative Law Judge (ALJ) found Escarcega had the severe impairments of big toe fusion and stress urinary incontinence, but these impairments solely or in combination did not meet or equal the listings. The ALJ determined she retained the residual functional capacity for a wide range of sedentary work with a sit/stand option.  The ALJ also found Escarcega had the ability to use judgment; to understand, carry out and remember simple instructions; to respond appropriately to supervision, coworkers and usual work situations; and to deal with changes in a routine work setting.  Relying on the testimony of a vocational expert, the ALJ found at step five Escarcega would be able to adapt to a significant number of other jobs in the national economy. Thus, the ALJ concluded Escarcega was not disabled within the meaning of the Social Security Act.  The Appeals Council denied Escarcega's request for review of the ALJ's decision.  Hence, the decision of the ALJ became the final decision of the Commissioner for judicial review purposes. Escarcega seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. §405(g).

The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether he applied correct legal standards. *Hamilton v. Secretary of Health and Human Services,* 961 F.2d 1495, 1497-98 (10th Cir. 1992). Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994).

In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in

substantial gainful activity. *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C. §423(d)(1)(A)). The regulations of the Social Security Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications. 20 C.F.R. § 404.1520 (a-f). The sequential evaluation process ends if, at any step, the Commissioner finds the claimant is not disabled. *Thompson v. Sullivan*, 987 F.2d at 1487.

At the first four levels of the sequential evaluation process, the claimant must show she is not engaged in substantial gainful employment, she has an impairment or combination of impairments severe enough to limit her ability to do basic work activities, and her impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or she is unable to perform work she had done in the past. 20 C.F.R. §§ 404.1520 and 416.920. At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering her residual functional capacity, age, education, and prior work experience. *Id.*

In support of her motion to reverse or remand the administrative decision, Escarcega argues the ALJ failed to develop the record, erred in his credibility determination, failed to do a pain analysis, and erred in failing to accurately report the testimony of the vocational expert.

The ALJ found Escarcega retained the residual functional capacity to perform a wide range of sedentary work.  Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. §404.1567 (a).

At the July 22, 1997 administrative hearing, Escarcega testified she suffered "a lot of pain" in her stomach which was followed by diarrhea.  Tr. 35.  She testified she suffered from these bouts of stomach pain and diarrhea sometimes as often as three times a week.  Tr. 38.  She also complained of pain in her right foot that was so debilitating she could not stand on it.  Tr. 35. Escarcega testified she suffered from "a lot of back pain." and complained "it hurt her a lot to stay sitting."  Tr. 35, 37.  Escarcega reported she was taking medications for her bladder, stomach pain and the diarrhea and saw her doctors on an average of three times a month.  Tr. 38, 39. Escarcega testified she had to catherize herself 3-4 times a day because she was unable to urinate on her own.  Tr. 39, 40.  In addition, because of her stress urinary incontinence, Escarcega had accidents (leakage) when she could not make it to the bathroom in time.  Tr. 40.

When the ALJ questioned Escarcega regarding her activities of daily living, she reported she could only sit comfortably for about ten minutes due to her back pain, could stand for about 20 minutes, could walk for about a block, could not lift very much weight, and could not bend, squat or kneel.  Tr. 43, 44.  Escarcega reported she could not squat or kneel because "her knee hurt a lot" and her lower back hurt because she limped so much.  Tr. 44.  Escarcega reported she used a cane which Dr. Miller prescribed.  Tr. 46.  In addition, Escarcega complained she suffered from dizziness, a side effect of the medication she took for her bladder problem.[1]  Tr. 45.  The dizziness required her to lie down anywhere from 45 minutes to an hour and a half in the morning and in the afternoon.  Tr. 46.

---

[1]   Escarcega takes oxybutynin chloride for her stress urinary incontinence.  Dizziness is listed as one of the adverse reactions to this medication. *Physician's Desk Reference* 511-12 (53rd ed. 1999).

4

When the ALJ presented the vocational expert with a hypothetical tailored to the testimony given by Escarcega, the vocational expert opined Escarcega could not work at any job. Tr. 52. However, in his decision, the ALJ asserted the vocational expert had testified that Escarcega could perform other work. Tr. 25. According to the ALJ's decision, the vocational expert came to this conclusion after reviewing the file and being present through Escarcega's testimony and after the ALJ presented a hypothetical which included Escarcega's major functional limitations. *Id.* The ALJ's finding is not supported by the record.

In terms of Escarcega's complaints of stomach and lower back pain, the medical evidence reflects the following. On February 16, 1993, Escarcega went to the emergency room at UNM Medical Center complaining of lower abdominal pain with the pain radiating to her right lower back. Tr. 155.[2] Tr. 119. On July 8, 1994, Escarcega went to the emergency room at UNM Medical Center complaining of rectal bleeding. Tr. 137. At that time, Escarcega complained of "burning pain" of her lower back. *Id.* The physician prescribed some medication and ordered a barium enema. *Id.* On July 12, 1994, Escarcega had a barium enema. Tr. 136. The radiologist found Escarcega had extensive pan diverticulosis with diffuse spasm throughout. *Id.* On August 4, 1994, Escarcega went to UNM Medical center complaining of "lots of low back pain" for one month and described it as "like I'm burning inside." Tr. 132. Additionally, Escarcega reported her left leg fell asleep and her right foot hurt all the time. *Id.* She also reported she was told that

---

[2]  Escarcega was diagnosed with diverticulitis in 1994. Diverticulitis is inflammation of a diverticulum, especially of the small pockets in the wall of the colon which fill with stagnant fecal material and become inflamed and may cause obstruction, perforation, or bleeding. *Stedman's Medical Dictionary* 513 (26th ed. 1995).

her hip and knee would be affected because of her right sided limp.  *Id.*  The physician diagnosed

her with sacral pain, ordered x-rays and referred her for physical therapy.  *Id.*  The physician also

ordered a urinalysis and culture and sensitivity.  *Id.*  On August 11, 1994, Escarcega went to

UNM Medical Center complaining of sharp pain intermittently for four days, abdominal

distention, and constant lower back pain.  Tr. 130.  Escarcega was already on antibiotics for a

urinary tract infection but had not experienced any relief with the medication.  *Id.*  On physical

examination, the physician noted tenderness over the left lower quadrant.  *Id.*  The physician

advised Escarcega to finish her antibiotics and prescribed more medication.  *Id.*  On September 7,

1994, Escarcega went to the UNM Medical Center for a follow-up visit.  Tr. 128.  The physician

diagnosed her with persistent lower abdominal pain, diverticulitis, lower back pain and recurrent

urinary tract infections.  *Id.*  On September 13, 1994, Escarcega had a consultation with a

physician who then ordered a colonoscopy to rule out diverticulosis.  Tr. 260.  The colonoscopy

was done on the same day and indicated Escarcega had moderate diverticulosis.  Tr. 259.

On January 20, 1995, Escarcega went to UNM Medical Center complaining of left lower

back pain for three weeks.  Tr. 123.  The physician ordered a pelvic ultrasound and prescribed

antibiotics.  *Id.*  On January 23, 1995, a pelvic ultrasound was performed on Escarcega.  Tr. 122.

Escarcega had a follow-up visit on the same day.  Escarcega continued to complain of lower

abdominal pain with the pain mainly over her left lower quadrant.  Tr. 256.  The physician

questioned whether Escarcega had diverticulitis since she had not responded to the antibiotic.  *Id.*

The physical exam revealed tenderness over the lower abdomen with slight guarding.  *Id.*  On

March 29, 1995, Escarcega went to UNM Medical Center complaining of diarrhea and lower

back pain for two days.  Tr. 255.  The physician diagnosed her with a urinary tract infection.  *Id.*

On August 1, 1995, Escarcega went to UNM Medical Center with complaints of severe lower abdominal pain with radiation to the back.  Tr. 120, 125, 258.  The physician assistant reported severe tenderness with guarding and referred her to the emergency room for a physician consultation to rule out appendicitis, diverticulitis and ovarian problems.  At the emergency room, Escarcega reported she had been experiencing the pain intermittently for about one year with the frequency increasing to every week and radiating to her back.  Tr. 118, 119.  The medical history indicated Escarcega had experienced loose, watery stools with some blood mixed in.  *Id.*  The physical exam revealed Escarcega had suprapubic and lower abdominal tenderness.  *Id.*  The physician referred Escarcega for a gastrointestinal follow-up and prescribed Imodium, an antidiarrheal drug.  *Id.*   On September 27, 1995, Escarcega went to UNM Medical Center complaining of "colicky abdominal pain."  Tr. 253.  The history reflects the frequency of the abdominal pain had increased to every 3-4 days with the pain radiating to the right lower quadrant and to the lower back.  *Id.*  Escarcega also reported having loose bowel movements with occasional blood.  *Id.*  The physical examination revealed tenderness over the right and left lower quadrant, with greater tenderness over the left lower quadrant.  *Id.*  The physician diagnosed Escarcega with diverticulosis with spasms and prescribed Bentyl 10 mg. four times a day for the pain.  *Id.*  Although the physician commented on weight loss, the copy of the physician's report is poor and thus it is difficult to read exactly what the physician noted.  *Id.*     On March 6, 1996, Escarcega went to UNM Medical Center complaining of abdominal pain, vomiting and diarrhea. Tr. 246.  The physician prescribed Imodium.  *Id.*   On May 1, 1996, Escarcega went to UNM Medical Center complaining of abdominal and back pain.  Tr. 245.  The physical exam revealed localized tenderness over the lower back.  *Id.*  The physician ordered x-rays of the spine and

Ibuprofen 600 mg three times a day. *Id.*   On June 22, 1996, Escarcega went to UNM Medical Center complaining of back pain, abdominal pain, diarrhea, and right foot pain. Tr. 239.   The physician's notes describe Escarcega's lower back pain as "burning/twisting, wakes pt [patient] at night, constant.   Exacerbated by abd [abdominal] pain. " *Id.*   At this visit, the physician also noted Escarcega altered her walking secondary to her right foot pain. *Id.* The physical exam revealed Escarcega had tenderness around her left upper and lower quadrants and her right upper quadrant. Tr. 240. The physician also noted tenderness over her spine with the greatest tenderness over her sacral area and some tenderness over her left hip. *Id.* In his assessment, the physician opined the back pain was "likely secondary to abnormal gait compensating." *Id.* He diagnosed Escarcega with mechanical back pain, irritable bowel syndrome and stress urinary incontinence. Tr. 239. The physician referred her for a physical therapy consultation for her back pain. *Id.* On July 25, 1996, Escarcega went to UNM Medical Center complaining of severe back pain for two weeks. Tr. 244. It appears that the physician referred her for an evaluation of her back pain. *Id.* On August 1, 1996, Escarcega had an anal sphincter EMG performed. Tr. 243. At that time, Escarcega reported she had been experiencing fecal incontinence with abdominal pain for one year. *Id.* According to the history, Escarcega had been experiencing these episodes every 1-2 weeks and always with loose watery diarrhea with blood in the stool. *Id.* On September 18, 1996, Escarcega was seen at UNM Medical Center for urinary incontinence. Tr. 308. At that time, Escarcega refused to be examined. *Id.* On September 30, 1996, Escarcega went to UNM Medical Center complaining of leakage of urine and was diagnosed with stress urinary incontinence, fecal incontinence and urinary tract infection. Tr. 238. The physician's assessment noted Escarcega's chronic back pain with increased symptoms. *Id.* The physician

ordered a urodynamics[3],  a urinalysis and culture and recommended a sphincteroplasty and stress incontinence repair post urodynamics.  *Id.*  Escarcega was seen on December 4, 11, 1996, for fecal incontinence, stress urinary incontinence and abdominal pain.  Tr. 298, 300, 301.

On January 6, 1997, Escarcega underwent a sigmoidoscopy in preparation for surgery scheduled for January 23, 1997.  Tr. 296.  On January 13, 1997, Escargega was seen at UNM Medical Center and had a physical examination in preparation for surgery scheduled for that month.  Tr. 290-293.  On January 23, 1997, Escarcega was admitted to University Hospital for surgery to correct her urinary and fecal incontinence.  Tr. 271, 272.  According to the discharge summary, she received a Bert retropubic urethropexy[4], posterior colporrhaphy[5], and iliococcygeal[6] vault suspension and a sphincteroplasty.[7]  Tr. 272.  During her stay in the hospital, Escarcega received instructions in suprapubic catheter care and her bladder training was begun.  *Id.*  The discharge summary notes also indicate Escarcega had been on Tofranil since 1996 for urge symptoms.  Tr. 271.  Escarcega returned for follow-up visits once in January and several times in

---

[3] Urodynamics is the study of the storage of urine within, and the flow of urine through and from, the urinary tract.  *Stedman's Medical Dictionary* 1894 (26th ed. 1995).

[4] Urethropexy is the fixation of urethra and bladder for stress incontinence. *Stedman's Medical Dictionary* 1891 (26th ed. 1995).

[5] Colporrhaphy is the repair of a rupture of the vagina by excision and suturing of the edges of the tear. *Stedman's Medical Dictionary* 369 (26th ed. 1995).

[6] Iliococcgeal relates to the ilium and the coccyx.  *Stedman's Medical Dictionary* 849 (26th ed. 1995).

[7] Sphincteroplasty is plastic surgery of any sphincter muscle. *Stedman's Medical Dictionary* 1648 (26th ed. 1995).

February.  Tr. 285-293.  On March 14, 1997, Escarcega went to UNM Medical Center
complaining of diarrhea and abdominal tenderness. Tr. 284.  Besides referring her for a
gynecological follow-up, the physician ordered a urinalysis, culture and sensitivity, and a stool
culture to rule out ova and parasites.  *Id.*  On May 15, 1997, Escarcega complained of left sided
pain radiating to her back.  Tr. 311.  The physician diagnosed a urinary tract infection with history
of urinary retention and prescribed antibiotics.  *Id.*  On May 19, 1997, Escarcega went to UNM
Medical Center complaining of pain in the right and left flank area.  Tr. 310.  At that time, she
complained of "persistent" pain in her sides and reported she was still catherizing herself and was
on antibiotics.  *Id.*  The physician diagnosed urinary retention and changed her antibiotic.  *Id.*  On
May 21, 1997,  Escarcega went to UNM Medical Center because she was not feeling better after
her last visit.  Tr. 312.  The physician changed her medication.  *Id.*   On June 4, 1997, Escarcega
went to UNM Medical Center complaining of pain in her left side which radiated to her back.  Tr.
309.  Escarcega described the lower back pain as "like burning."  *Id.*   The physician diagnosed
her as suffering from urinary retention, musculoskeletal pain and possibly perimenopausal.  *Id.*
The physician ordered a urinalysis and culture and sensitivity to rule out a urinary tract infection.
*Id.*  On July 16, 1997, Escarcega went to UNM Medical Center complaining of abdominal pain
with diarrhea and back pain.  Tr. 356.  Her history indicated a breakdown of the sphincter repair
done for her fecal incontinence, a decrease in urine when she attempted to urinate on her own,
and leakage of urine when she stood up.  Additionally, Escarcega complained of abdominal pain
and back pain which she reported was associated with urinary urgency.  *Id.*  The physician
diagnosed her with urinary retention.  *Id.*  On September 10, 1997, Escarcega went to UNM
Medical Center complaining of left flank pain, urinary retention, and lower abdominal pain with

diarrhea.  Tr. 353.  The physical exam indicated Escarcega had tenderness over her left flank area

and CVA tenderness.  *Id.*  The physician diagnosed her with urinary retention and urinary tract

infection and prescribed antibiotics.  *Id.*  On September 16, 1997, Escarcega went to UNM

Medical Center complaining of postural dribbling and urge incontinence, back pain, diarrhea and

rectal pain.  Tr. 344.  She reported that she was catherizing herself three times a day.  *Id.*  The

physician diagnosed her with urinary retention with hypotonic bladder overflow and increased her

blood pressure medicine (Prazosin).  *Id.*  On September 30, 1997, Escarcega went to UNM

Medical Center for a follow-up for a urinary tract infection.  Tr. 338.  Escarcega reported she had

pain over her left flank area, especially of her back with urinary tract infections.  *Id.*  On October

01, 1997, Escarcega went to UNM Medical Center complaining of periumbilical pain and diarrhea

for three years.  She reported increased symptoms of her abdominal pain for the past seven

months and also complained of burning pain with an urge to urinate and reported the pain radiated

to her lower back.  Tr. 337.  The physical exam indicated pain over the left lower quadrants and

the left upper quadrant.  *Id.*  The physician diagnosed her with irritable bowel syndrome,

discontinued the dicyclomine and prescribed amitriptyline.  *Id.*

As far as her right foot pain is concerned, the medical evidence reflects the following.  On

November 6, 1989, Escarcega went to UNM Medical Center complaining of  pain of the right

great toe of two months duration.  Tr. 159, 160.  The physical exam revealed the right foot was

painful to touch.  The physician ordered x-rays and diagnosed her with hallux valgus.[8]  *Id.*  The

physician also referred her to the orthopedic clinic.  *Id.*  On June 11, 1993, Escarcega saw a

---

[8] A deviation of the tip of the great toe, or main axis of the toe, toward the outer or lateral side of the foot.  *Stedman's Medical Dictionary* 759 (26th ed. 1995).

physician at University Hospital complaining of right foot pain.  Tr. 153.  The physician also

ordered x-rays that day.  Tr. 154.  The history indicated she had a neuroma in the third inner

space that had been removed in Albuquerque five years before.  Escarcega also reported having

bunion surgery and second toe surgery in El Paso three years before.  Tr. 153.  She reported she

had been doing well until several months before when the ball of her foot had become "exquisitely

tender," requiring her to walk on the lateral border of the foot.  *Id.*  She also reported heel and

arch pain.  The physical exam revealed tenderness over the plantar surface of the second and third

metatarsals, under the first metatarsal head around the sesamoids, and over the third inner-space.

*Id.*  The physician's impression was that  Escarcega had some sesamoiditis and possibly a

recurrent neuroma.  The physician prescribed Motrin and scheduled her for a reevaluation in six

weeks.  *Id.*   On July 23, 1993, a physician evaluated Escarcega for right foot pain and ordered x-

rays of the right foot.  Tr. 151, 152.  The history revealed Escarcega had been suffering "pain

over the last three years with worsening over the last year, especially over the right

metatarsophalangeal (MTP)[9] joint and the second and third MTP joints."  *Id.*   The physician also

noted she had been working but developed pain after a short of period of time and was able to

work only for about three hours.  *Id.*  The physical exam indicated Escarcega was very tender

over the right first MTP joint.  *Id.*  The physician recommended fusion of the first MTP joint and

directed Escarcega to consider it and call back to set up a surgery date.  *Id.*  On September 24,

1993, a physician evaluated Escarcega for right foot pain.  Tr. 150.  The physician's notes indicate

she suffered "pain with ambulation and attempted motion at the great toe MTP joint on the right

---

[9]     Relating to the metatarsal bones and the phalanges;
denoting the articulations between them.  *Stedman's Medical
Dictionary* 1100 (26 ed. 1995).

side." *Id.* The history indicated Escarcega had severe problems with her great toe ever since she had bunion surgery three years before. *Id.* The physician also noted she walked on the lateral border of her foot in order not to place any pressure on the great toe. *Id.* The physical exam revealed she was "quite tender on palpation" at the MTP joint and, after reviewing the x-rays, the physician opined Escarcega had developed joint pain and stiffness secondary to her previous surgery. *Id.* Because anti-inflammatory medications did not help Escarcega, the physician discussed other treatment options with Escarcega, and she opted for arthrodesis[10] of the right great toe MTP joint. *Id.* On September 27, 1993, Dr. Miller performed the arthrodesis of the right great toe MTP joint. Tr. 261. On October 1, 1993, a physician examined Escarcega five days post-op fusion of her right great toe phalangeal joint and reported normal post-operative pain. Tr. 149. On October 22, 1993, a physician evaluated Escarcega status post a right MTP joint fusion. Tr. 147. At that time, Escarcega had no complaints. *Id.* On December 3, 1993, a physician examined Escarcega at University Hospital. Tr. 145. This was a follow-up visit for status post right first MTP arthrodesis which was performed on September 27, 1993. Tr. 145. Escarcega was still complaining of pain and was informed it would take several months for her symptoms to resolve. *Id.* On March 11, 1994, Escarcega went to University Hospital with complaints of "pain over her first toe such that she [was] not even able to bear weight." Tr. 144. On physical examination, the physician noted "extreme point tenderness on the very lightest of palpation over her scar dorsally and her first metatarsal head." *Id.* The physician opined Escarcega had over sensitive skin in the area secondary to scar formation. *Id.* The physician

---

[10] The stiffening of a joint by operative means. *Stedman's Medical Dictionary* 150 (26th ed. 1995).

13

referred Escarcega to physical therapy for scar desensitization. Tr. 144.  Escarcega received

physical therapy for her right foot pain on April 1, 1994.  Tr. 142.  Escarcega described her pain

to the therapist severe to "the point she wants to vomit"and reported she could not wear any kind

of shoe except sneakers.  *Id.*  The therapist reported Escarcega was "very sensitive to any touch."

*Id.*  On April 5, 1994, a therapist evaluated Escarcega and noted her complaints of knee and hip

pain from her inability to bear weight on her right foot.  Tr. 141.  Escarcega reported she had to

walk on the outside of her right foot to avoid any pressure on her toe.  *Id.*  Escarcega received

physical therapy on April 22 and 27 and May 2, 1994.  Escarcega reported increased pain of her

right foot and some improvement of her gait.  Tr. 140.  The therapist reported some improvement

in sensitivity but noted Escarcega still complained of pain with weight bearing on right toe, and

with prolonged standing.  Tr. 142.  The therapist gave Escarcega MT (metatarsal) pads.  *Id.*   On

May 6, 1994, a physician examined Escarcega at University Hospital for pain of the right foot.

Tr. 139.  The physician's notes indicate Escarcega was "status post a fusion of the right great toe

MTP for complications from bunion surgery."  *Id.*  At that time, Escarcega was unable to bear

weight and was receiving physical therapy.  *Id.*   However, she was still having difficulty placing

pressure on the great toe when she walked.  *Id.*  She was using high top tennis shoes, an orthotic

device, and pain medication to help her with her pain.  *Id.*  The physician noted Escarcega had

been having symptoms of trochanteric bursitis and difficulty laying on her right side.  *Id.*

Escarcega also suffered from a "diffuse callus beneath her third metatarsal head and hammering

(hyperflexion) of the second and third toes which rub the top of the toes at the proximal

interphalangeal joint.  *Id.*  The physician gave Escarcega a toe crest to help maintain her toes in a

more flexed position in the MTP joint and a two week supply of pain medication.  *Id.*  On July 29,

1994, the physician examined Escarcega at University hospital. Tr. 133, 134. Escarcega complained of pain of her right foot. The physician's notes indicate Escarcega had a right grate toe MTP joint fusion the year before and had continued to complain of pain, especially with ambulation. *Id.* The physician prescribed shoe inserts to cushion the painful, tender areas and advised Escarcega to consider operative intervention to take out the plate which was used for the fusion of the toe. *Id.* The physician's notes reflect Escarcega understood his recommendation and was willing to follow it. *Id.* On November 4, 1994, Escarcega went to University Hospital where a physician examined her for increased pain of her right first MTP joint. Tr. 127. Escarcega had undergone a fusion of the right first MTP joint approximately one year prior to this visit. *Id.* The physician's notes indicate a painful callous over the right third metatarsal head and pain over the right first MTP joint. *Id.* The physician recommended removal of the hardware of the first MTP joint. *Id.*

On January 6, 1995, Escarcega went to University Hospital for her preoperative visit. Tr. 257. Escarcega was scheduled to have surgery to remove the implants after the first MTP fusion "to see if this [would] relieve her symptoms . . . . " *Id.* Dr. Miller's history indicated Escarcega had a prolonged history of right foot pain on the dorsal aspect of her right foot which limited her ambulation and ability to work *Id.* At that time, Escarcega stated to Dr. Miller that she was unable to work because the pain was so bad that she had to walk on the lateral border of her foot because she was unable to bear weight across the medial side of her foot. *Id.* The physical examination revealed Escarcega was quite tender over her first MTP joint with the hardware palpable underneath the skin. Dr. Miller noted she had a custom molded arch support inside her shoe which she stated did not help at all. *Id.* Dr. Miller recommended removal of the implants to

15

see if it would relieve her symptoms over the first metatarsal head and the medial side of her foot and allow her to distribute her weight better over her foot. *Id.* On September 20, 1995, Dr. Miller examined Escarcega. Tr. 254. His notes indicate he had previously performed a fusion of her great toe MTP joint. Dr. Miller's notes also indicate Escarcega was having pain at the implant and desired to have the implant removed. *Id.* Additionally, Dr. Miller noted Escarcega had an intractable plantar[11] keratosis[12] which was diffuse beneath the third metatarsal head and which continued to cause her pain so that she was unable to put pressure on her forefoot comfortably in spite of the use of a variety of pads. *Id.* At that time, Escarcega requested the plantar keratosis be surgically corrected. Dr. Miller explained that he could perform an osteotomy of the third metatarsal to remove the bony prominence but advised Escarcega that, although the procedure was indicated, it may not help her pain. *Id.* On that same day, x-rays were taken of Escarcega right foot in preparation for surgery which was scheduled for September 28, 1995. Tr. 117. The x-ray report indicates fusion at the first MTP joint with increased ankylosis[13] across the joint. *Id.* On September 28, 1995, and November 10, 1995, more x-rays were taken of Escarcega's right foot, status post implant removal. Tr. 113, 115. On October 4, 1995, Escarcega returned for a follow-up visit status post plate and screw removal from her great toe. Tr. 252. The physician's notes indicate that, prior to the operation, Escarcega had decided not to undergo the metatarsal

---

[11] Relating to the sole of the foot. *Stedman's Medical Dictionary* 1375 (26th ed. 1995).

[12] Any lesion on the epidermis marked by the presence of circumscribed overgrowths of the horny layer. *Stedman's Medical Dictionary* 916 (26 ed. 1995).

[13] Stiffening or fixation of a joint as the result of a disease process, with fibrous or bony union across the joint. *Stedman's Medical Dictionary* 93 (26th ed. 1995).

16

osteotomy and thus only plate removal was performed. *Id.* On October 13, 1995, Escarcega was seen at the orthopedic clinic two weeks status post implant removal. Tr. 251. At that time, she was doing well. *Id.* On November 10, 1995, Escarcega was seen at UNM Medical Center for follow-up of status post implant removal . Tr. 249, 250. Although Escarcega reported the pain in the right great toe was slightly improved, she complained of pain in the planter aspect of the third metatarsal head and reported she had been unable to ambulate well and was having referred pain of the right knee and foot. *Id.* The physical examination indicated moderate pain with palpation over the third metatarsal head on the right foot. Her gait also revealed supination of the right foot with weight bearing and ambulation. *Id.* On October 13, 1995, Escarcega returned for a follow-up visit status post implant removal and was doing well. Tr. 251.

On October 4, 1996, Escarcega went to UNM Medical Center complaining of pain of right foot. Tr. 236. The physician diagnosed her with right toe metatarsalgia[14] and scheduled her for surgery (osteotomy). On November 1, 1996, Dr. McAdams examined Escarcega in preparation for the surgery scheduled for November 18, 1996. Tr. 304. The physical examination indicated a prominent metatarsal head which was tender with callus formation. *Id.* Dr. McAdams diagnosed her with a transfer pain lesion to her third metatarsal head. *Id.* On November 18, 1996, Drs. Miller and Cashmore performed a right third metatarsal plantar condylectomy.[15] Tr. 302. On December 6, 1996, Dr. Miller evaluated Escarcega three weeks

---

[14] Pain in the forefoot in the region of the heads of the metatarsals. *Stedman's Medical Dictionary* 1100 (26th ed. 1995).

[15] Excision of a condyle (a rounded articular surface at the extremity of a bone). *Stedman's Medical Dictionary* 380 (26th ed. 1995).

status post right third metatarsal plantar condylectomy.  Tr. 299.  Dr. Miller noted the

metatarsalgia had been unresponsive to non-operative treatment.  *Id.*  On December 27, 1996,

Escarcega returned for her post-operative visit and reported she was still having some pain.  Tr.

297.  Dr. Miller debrided a residual callus and scheduled her for a return visit in two month.  *Id.*

On September 12, 1997, Escarcega returned to University Hospital for a follow-up of her

foot surgery and continued pain of her right foot.  Tr. 346-348.  The physician noted continued

tenderness over the metatarsal heads and gave Escarcega a metatarsal pad.  *Id.*  This is the last

visit for right foot pain found in the record.

Escarcega's lengthy medical history reflects she suffered, from chronic bouts of

diverticulitis (often diagnosed as irritable bowel syndrome throughout the medical records),

chronic urinary tract infections secondary to urinary retention, stress urinary incontinence, chronic

debilitating pain of her right foot, and chronic lower back pain aggravated by the diverticulitis, the

urinary tract infections and her abnormal gait caused by her inability to put weight on her right

foot.  The record also makes it clear that Escarcega sought medical treatment for all her medical

conditions and followed the physicians' recommendations, including undergoing multiple

surgeries in her attempt to obtain relief for her medical problems.

In support of his conclusion that Escarcega was not disabled, the ALJ cites to Dr. Miller's

January 6, 1995 preoperative examination of Escarcega (257).[16]  Tr. 18.  The ALJ then cites to a

Escarcega's October 13, 1995 visit to the Ortho General Clinic in which the examining physician

reports she is doing well status post implant removal (Tr. 251).  *Id.*  In terms of her urinary stress

---

[16] Although the ALJ's decision states the visit took place on
June 6, 1995, the record reflects the visit took place January 6,
1995.  *See* Tr. 257.

incontinence, the ALJ cites to Dr. Rogers' discharge summary (Tr. 271) to conclude Escarcega's stress incontinence was appropriately treated.  Tr. 19.  The ALJ further states "follow-up records are unremarkable and do not describe any functional limitations."  Tr. 20.  This conclusion is not supported by the record.   Absent from the ALJ's decision is any mention of Escarcega's complaints of stomach pain accompanied by diarrhea or her lower back pain.

Contrary to the ALJ's findings, the record reflects that surgical intervention did not alleviate Escarcega's right foot pain or her urinary incontinence.  The record clearly reflects Escarcega continued to have right foot pain after surgery and continued to suffer urinary incontinence after her pelvic reconstruction.  When questioned by the ALJ concerning her urinary and fecal incontinence, Escarcega testified the surgery "worsened me."  Tr. 46.  She explained that before her pelvic reconstruction she could urinate by herself.  *Id.*  The ALJ did not ask her any further questions.  Escarcega continued to suffer from urinary retention, chronic urinary tract infections, urinary leakage, and now had to self-catherize three to four times a day.

**Nonexertional Impairment, Pain**

Although none of Escarcega's treating physicians diagnosed her as having disabling pain, nonetheless, Escarcega is entitled to have her nonmedical objective and subjective testimony of pain evaluated by the ALJ and weighed alongside the medical evidence.  *Huston v. Bowen*, 838 F.2d 1125, 1131 (10th Cir. 1988).  An ALJ may not ignore the evidence.  *Id.*  In evaluating a claim of disabling pain, the proper analysis requires the ALJ to consider (1) whether there is objective medical evidence of a pain producing impairment, (2) whether there is a loose nexus between this objective evidence and the pain and (3) whether, in light of all the evidence, both objective and subjective, the pain is in fact disabling.  *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th

19

Cir. 1994) (citing *Luna v. Bowen*, 834 F.2d 161, 163 (10th Cir. 1987)).

When determining the credibility of pain testimony, the ALJ should consider such factors as: the levels of medications and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, and the consistency or compatibility of nonmedical testimony with objective medical evidence.  *Huston*, 838 F.2d at 1132.

After noting the general regulations and law governing assessment of pain, the ALJ stated:

In the case at bar, claimant has right big toe fusion and stress incontinence.  She says this impairment causes disabling pain.  Since claimant's combination of impairments may cause pain, evaluation of the intensity, persistence and limiting effects of claimant's symptoms of pain is necessary.

The objective medical evidence at bar contains no indication of muscle atrophy, swelling, muscle spasm, prolonged bedrest, or premature aging.  There is no neurological dysfunctions or deteriorations.  There is no evidence of weight loss due to loss of appetite.  Medical reports show claimant was 170 pounds, slightly overweight.  Regarding the use of assistive devices, claimant uses a cane to walk about.  There is no evidence showing a cane is medically necessary.

Claimant can clean, cook, shop and care for her personal need.  She performs these activities independently and appropriately.

The location of claimant's pain is generalized, duration short, frequency occasional, and intensity mild.

Claimant's pain is precipitated by lifting light to heavy weights, or prolonged standing and walking.

There are no adverse side effect [to medications] indicated.

 Accordingly, based on the medical reports and claimant's testimony at the hearing, claimant has good daily activities and cares for her personal needs.  The report (sic) of Drs. Rogers and Pribyl is credited on the issue of claimant's ability to perform work related activities.  Based on Drs. Rogers and Pribyl's findings,

claimant was allowed to work at sedentary levels.

There is no longitudinal medical history for treatment of disabling pain.

The evidence supports the conclusion that claimant exaggerates her allegations of pain.  Adopting Drs. Rogers and Pribyl's findings, claimant's pain is mild and alleviated with (sic) by activity limited to sedentary work.  It does not reduce her RFC below the wide range of sedentary work.

Tr. 18-27.

The ALJ found Escarcega's allegations of disabling pain were not credible because he found  the objective medical evidence contained "no indication of muscle atrophy, swelling, muscle spasm, prolonged bedrest, or premature aging."  Tr. 23.  The ALJ also noted no neurological dysfunctions or deteriorations or weight loss.  *Id.*   However, "the claimant is not required to produce medical evidence proving the pain is inevitable."  *Thompson v. Sullivan*, 987 F.2d 1482, 1489 (10th Cir. 1993)(citing *Frey v. Bowen*, 816 F.2d 508, 515 (10Cir. 1987).  A claimant must establish only a loose nexus between the impairment and the pain alleged.  *Luna*, 834 F.2d at 164.   In this case, the ALJ found "claimant's combination of impairments may cause pain" and considered her assertions of severe pain and assessed her credibility.  However, the ALJ's determination that Escarcega's allegations of disabling pain were not credible is not supported by substantial evidence.  Although the Court ordinarily defers to the ALJ as trier of fact on credibility, deference is not an absolute rule.  *Frey*, 816 F.2d at 517.

To begin with, the reports of Drs. Rogers and Pribyl do not address the issue of Escarcega's ability to perform work related activities or the severity of her pain.  At the time Escarcega saw Dr. Pribyl, she was there for a routine follow-up, two weeks after having her implant removed.  Tr. 251.  At that time she was doing well, i.e., her sutures were intact, her

wound was clean, dry, and intact with no erythema or drainage.  *Id.*  Dr. Pribyl recommended

removal of the sutures, steri-stripping of the would, and a return visit in two weeks.  *Id.*  Dr.

Rogers' report is a discharge summary outlining Escarcega's medical history, physical

examination, laboratory data, hospital course, operations, discharge diagnosis, discharge

medications, and disposition and recommendations.  Tr. 271, 272.

The ALJ's conclusion that there is no longitudinal medical history for treatment of

disabling pain is also contrary to the evidence.  The record clearly reflects a long history of

complaints of increasing pain with frequent visits to medical care providers and multiple surgeries.

Moreover, none of the physicians who examined Escarcega rejected her complaints of pain as

unfounded.  And, even though Escarcega testified Dr. Miller prescribed a cane, the ALJ

discounted Escarcega's use of a cane as not medically necessary.  Considering Escarcega's

medical history regarding her right foot, Escarcega's use of a cane to assist her ambulation would

certainly be medically indicated.  In this case, the ALJ ignored the medical evidence supporting

her claim of disabling pain.

**Full Range of RFC-Level Work**

Relying on the findings of Drs. Rogers and Pribyl, the ALJ determined Escarcega retained

the RFC to "perform the wide range of sedentary work."  Tr. 21.  This finding must be supported

by substantial evidence.  However, it appears not to be supported by any evidence.  In this case,

there was no functional capacity assessment performed.  Tr. 22.  The ALJ had the discretion to

order a consultative examination of Escarcega to determine her capabilities but failed to do so.

*Thompson*, 987 F.2d at 1491. Moreover, as noted previously, Drs. Rogers and Pribyl's reports do

not touch on Escarcega's ability to work or the severity of her pain.  Additionally, in his decision,

the ALJ states the vocational expert (1) sat through the entire hearing and heard the examination of claimant concerning her physical and mental impairments; (2) reviewed the relevant medico-vocational document in the record; and (3) was fully apprised of the claimant's exertional and non-exertional limitations by the Court.  Tr. 24, 25.  According to the ALJ's decision, in response to the ALJ's hypothetical question, which included Escarcega's major functional limitations, the vocational expert testified she could perform other work.  Tr. 25.  However, the record reflects that when the ALJ tailored the hypothetical question to the testimony, the vocational expert opined Escarcega could not work at any job.  Tr. 52.

Considering the record as a whole, the Court finds the ALJ's decision is not supported by substantial evidence.  Although Escarcega claims the ALJ failed to develop the record as to her back pain by failing to request a consultative examination, the Court finds that a consultative examination is unnecessary.  The record reflects Escarcega's back pain stems from her inability to bear weight on her right foot which produces an abnormal gait and is further aggravated by the diverticulitis and the recurrent urinary tract infections.  Accordingly, the Court finds that the Secretary failed to meet his burden at step five of the sequential process.  Escarcega's Motion to Remand or Reverse should be granted.  This case should be reversed and remanded to the Secretary with instructions to grant Escarcega benefits.

## **RECOMMENDED DISPOSITION**

The ALJ's decision is not supported by substantial evidence. Escarcega's Motion to Reverse and Remand Administrative Decision, filed June 12, 2000, should be granted. This case should be reversed and remanded to the Secretary with instructions to grant Escarcega Social Security benefits.


**JOE H. GALVAN**
**UNITED STATES MAGISTRATE JUDGE**


## **NOTICE**

Within ten days after a party is served with a copy of these proposed findings and recommended disposition that party may, pursuant to 28 U.S.C. § 636 (b)(1), file written objections to such proposed findings and recommended disposition. A party must file any objections within the ten day period allowed if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.

24